IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MORGAN BENJAMIN | ) | CASE NO: 1:17-cv-2509 |
| | ) | Calendar: |
| v. | ) | |
| | ) | |
| DANIEL THOMPSON | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HUFFNPUFF | ) | |

FITNESS REPAIR

LLC

## PLAINTIFF'S COMPLAINT AT LAW

**I.**                    <u>**NATURE OF THE CASE**</u>

This action arises under the Fair Labor Standards Act ("FLSA"), 29 USC Section 201 et seq.,; the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/ et seq.,; the Illinois Wage Payment and Collection Act ("WPCA"), 820 ILCS 115/ et seq.; and the Declaratory Judgment Act, 28 USC Section 2201 ("Declaratory Judgment Act") seeking compensatory and statutory damages. Mr. Benjamin further alleges that Defendant(s) through a series of actions have tortiously interfered with his prospective economic advantage. Mr. Benjamin seeks compensatory and punitive damages

**II.**                    <u>**JURISDICTION AND VENUE**</u>

1.      This Court's jurisdiction is proper pursuant to 28 USC Section 1331. Plaintiff Morgan Benjamin ("Plaintiff" "Mr. Benjamin") alleges violations of 29 USC Section 201 et seq.

2.      Mr. Benjamin is a resident of Cook County, Illinois.

3.      Defendant Daniel Thompson is a resident of Kane County, Illinois.

4.      Defendant HuffnPuff LLC is an Illinois limited liability company with a headquarters in Kane County, Illinois, and conducts business primarily throughout Kane, DuPage, Lake, Will, and Cook Counties in Illinois, occasionally offering services to clients in neighboring states.

5.      Venue is proper pursuant to 28 USC Section 1391, subds. (b) and (c).


## III.                         THE PARTIES

6.      Morgan Benjamin, at all times relevant, was a resident of Cook County, Illinois and between approximately May 24, 2013 and April 15, 2015 ("the Employment Period"), was an employee of Defendant(s) Daniel Thompson and HuffnPuff, LLC.

7.      HuffnPuff LLC ("Defendant LLC"; "HuffnPuff"; "HnP") was at all times relevant an Illinois Limited Liability Company, providing exercise and training equipment repair services to clients through Northeastern Illinois, including throughout Cook County, Illinois, and to clients in Wisconsin and Indiana.

8.      For the entirety of the Employment Period Defendant(s) were the employers of Mr. Benjamin.

9.      Daniel Thompson, residing in North Aurora, Illinois is the owner of and Registered Agent for HuffnPuff LLC, an Illinois Limited Liability Company offering mechanic

repair services for training and fitness equipment in Northeast Illinois, including throughout Kane, DuPage, Lake, Will, and Cook Counties, and occasionally in neighboring states.

10. Defendant HuffnPuff relies upon replacement parts purchased from manufacturers throughout the United States to conduct its primary business, repair and maintenance of training and fitness equipment.

11. Defendant HuffnPuff offers its services to clients in Wisconsin and Indiana.

12. Defendant HuffnPuff has sent Mr. Benjamin and other technicians to undergo training and conduct repairs in other states, including California, Indiana, and Wisconsin.

IV. **FACTUAL BACKGROUND**

*Establishment of an Employment Relationship Between the Parties.*

13. Defendant Thompson, on or about May 24, 2013, employed Mr. Benjamin to work for him and Defendant Huff n' Puff LLC, as a mechanic repairing exercise and training equipment.

14. Mr. Benjamin was permitted to work by Defendant(s) from May 31, 2013 to on or about April 30, 2015 ("Employment Period") as a mechanic.

15. On or about August 15, 2014, Defendant(s) induced Mr. Benjamin to sign a contract, ("August 2014 Contract") attached and incorporated hereto as EXHIBIT A, which purported to categorize Mr. Benjamin as a non-employee independent contractor, and included a non-competition and non-solicitation agreement that read in in full,

Contractor agrees not to work for such service/repair order customers as Client shall from time to time refer except as Client shall from time to time give permission to serve. This restriction shall not apply to any service/repair customers who request

services from Contractor more than two years from the last date on which Client shall have referred a service repair order naming them as customers of Client to Contractor.

16. The August 2014 Contract contained no severability provision.

17. None of the terms of Mr. Benjamin's employment, including but not limited to rate or frequency of pay, non-pecuniary benefits such as health care or vacation or sick pay, volume or quality of work, reimbursements, or any working conditions, were in any way altered as a result of the signing of this contract.

18. For the entire duration of the Employment Period, Mr. Benjamin was a non-exempt employee under the provisions of the Fair Labor Standards Act.

19. For the entire duration of the Employment Period, Defendant HuffnPuff LLC was a covered employer for purposes of the Fair Labor Standards Act.

*Mr. Benjamin's Day-to-Day Work*

20. Defendant HuffnPuff, is an Illinois Limited Liability Company organized for the primary purpose of providing repair and maintenance services to owners and lessors of training and fitness equipment, which service Mr. Benjamin provided on behalf of Defendant(s).

21. Mr. Benjamin as a technician performed the core service of Defendant HuffnPuff's business.

22. For the entire duration of the Employment Period, Defendant(s) assigned Mr. Benjamin's daily tasks via email.

23. Defendant(s) provided Mr. Benjamin with specific protocols for repair of equipment, both informally and in the form of manuals ("Technician Manual"; see "EXHIBIT B"), requiring Mr. Benjamin to follow specific procedures when conducting repairs.

24. Defendant(s) issued to Mr. Benjamin a "company ID badge," and was required by the Defendants' Technician Manual to carry it.

25. Defendant(s) required, via the Technician Manual. that Mr. Benjamin follow specific protocols, including the precise timing of phone calls, prior to engaging with Defendant(s)'s clients prior to each service call.

26. The Technician Manual included a detailed 23-step procedure for each service call.

27. The Technician Manual provided specific procedures for return of parts and tools to a storage unit owned or rented by Defendant(s), where Mr. Benjamin had a "designated shelf."

28. Defendant(s) punished deviation from repair and other work protocols by assessing wage deductions ("penalties"; "fines") and deducting pay from Mr. Benjamin.

29. Mr. Benjamin's pay was set according to a formula created by Defendant(s), at approximately $45 per repair visit, which visits varied in length but typically lasted approximately one hour.

30. Defendant(s) provided to Mr. Benjamin tools, parts, equipment and manuals necessary for the repair of equipment, and threatened legal action to achieve recovery of these materials after the termination of the Employment Period.

31. Mr. Benjamin worked continuously, with the exception of vacations and periods of illness, for Defendant(s) for the entire Employment Period.

32. Mr. Benjamin lacked opportunity to secure ancillary employment because of the rigorous work schedule required by Defendant(s) as a condition of continued employment.

33. Defendant(s) paid Mr. Benjamin at a regular rate equivalent to $45 per hour, based on the average time of a service call.

34. Throughout the Employment Period, Defendant Dan Thompson was Mr. Benjamin's primary point of contact and Mr. Benjamin was subject to Defendant Thompson's discipline in the form of penalties and fines.

35. Defendant(s) directed Mr. Benjamin to undertake a significant amount of his work throughout Illinois.

36. Defendant(s) directed Mr. Benjamin to attend a training in the state of California.

37. Defendant(s) occasionally dispatched employee technicians, including Mr. Benjamin, to service calls in Indiana and Wisconsin.

38. Throughout the Employment Period, Defendant employers permitted Mr. Benjamin to work hours in excess of forty hours per week without any increase in his base hourly rate of compensation.

39. Upon information and belief, after Mr. Benjamin ended his employment relationship with them, on or about August 2015, Defendant(s) converted then-employed putative "independent contractors" to covered employees as defined by relevant Illinois and federal statutes.

40. Upon information and belief, the employees referenced in Paragraph 39 performed the same tasks as prior to this conversion.

.   *Scheduling and Timing of Mr. Benjamin's Work Day*

41. For the entire duration of the Employment Period, Defendant(s) sent Mr. Benjamin a schedule for client repairs.

42. For the entire duration of the Employment Period, Defendant(s) dictated to Mr. Benjamin the appropriate traveling route to take from assignment to assignment, and the procedure for documenting these repair visit.

43. Defendant(s) required Mr. Benjamin to treat his home as his "home base," for work purposes, and required him to prepare for the day's assignments in the morning prior to leaving his home.

44. On numerous occasions, typically at least once per week, Defendant(s) required Mr. Benjamin to travel to a warehouse in Aurora, Illinois, to secure parts and tools, provided by Defendant(s), for purposes of repair visits.

45. Defendant(s) required Mr. Benjamin to transmit documentation of repairs to Defendant Thompson within thirty minutes of each service visit, or face "fines."

*Instances of Work Weeks Over Forty Hours Worked by Mr. Benjamin on Behalf of Defendant(s)*

46. Upon information and belief, Defendant(s) permitted Mr. Benjamin to work in excess of forty hours in numerous weeks not specifically alleged in this Subsection.

47. Defendant(s) knowingly failed to compensate Mr. Benjamin at a rate commensurate with one-and-one-half (1.5) times his regular rate of pay of forty-five dollars ($45) per hour, or twenty five dollars and fifty cents ($22.50) for any of those hours over forty hours Defendant(s) permitted Mr. Benjamin to work.

48. Upon information and belief, Plaintiff worked an average of FORTY-EIGHT hours per week for those weeks he worked during the Employment Period.

49. Defendant(s) willfully refused to pay an overtime rate.

50.     Upon information and belief, Defendant(s) did not treat Mr. Benjamin and other employees as covered employees in representations to the Internal Revenue Service and Illinois Department of Revenue, and failed to pay payroll and income taxes.

51.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work greater than forty hours in the week ending March 14, 2014;

52.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work greater than forty hours in the week ending May 23, 2014;

53.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work greater than forty hours in the week ending June 13, 2014;

54.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work at least forty-eight hours in the week ending June 20, 2014;

55.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work at least forty-eight hours in the week ending August 01, 2014;

56.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work greater than forty hours in the week ending September 26, 2014;

57.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work at least fifty-five hours in the week ending November 14, 2014;

58.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work at least fifty-two hours in the week ending December 05, 2014;

59.     Upon information and belief, Mr. Benjamin was permitted by Defendant(s) to work greater at least forty-five hours in the week ending December 12, 2014;

60. Upon information and belief, Defendant(s) permitted Mr. Benjamin to work at least five (5) hours, and as many as twenty (20) over forty hours in each of the weeks listed above;

61. Defendant(s) knowingly permitted Mr. Benjamin to work more than forty hours in each of the foregoing weeks.

62. Defendant(s) knew or should have known that Mr. Benjamin's work requirements offered only trivial opportunity to work outside of HuffnPuff, was a covered employee, and was entitled to overtime pay for hours worked over forty hours.

63. Upon information and belief, Defendant(s) purchased and relied upon parts and tools manufactured outside of Illinois and provided them to Mr. Benjamin and other technicians employed by Defendant(s).

64. Upon information and belief, Defendant(s) acted willfully to avoid their responsibilities under the FLSA, IMWL, and IWPCA.

*Maintenance of Employee Records and the Personnel Records Review Act*

65. Defendant(s) failed to keep contemporaneous time cards or track specific work hours for the entire duration of the employment period.

66. Throughout the Employment Period, Defendant(s) required Mr. Benjamin to use an internal email communication and information storage system to manage his work schedule, appointments, pay stubs, and other information and data relating to his employment, and he did not release this information to Mr. Benjamin upon termination of his employment.

67.     On or about December 16, 2015, Mr. Benjamin requested a copy of his personnel

        records from Defendant(s) pursuant to the Illinois Personnel Records Review Act

        ("Records Act"), 820 ILCS 40/ et seq.

68.     On or about December 23, 2015, Mr. Benjamin received from Defendant(s) a request

        for an extension for compliance with the Records Act.

69.     As of the filing of this action, Defendant(s) had not yet complied with the Records

        Act.

70.     As of the filing of this action, Defendant(s) persisted in their refusal to treat Mr.

        Benjamin as a covered employee for purposes of the Records Act.

71.     That at all times relevant, there existed and was in full effect a statute known as the

        Illinois Personnel Records Review Act, 820 ILCS 40/ et seq., which provides in

        relevant part,

>       Sec. 4. Personnel record information which was not included in the personnel
>       record but should have been as required by this Act shall not be used by an
>       employer in a judicial or quasi-judicial proceeding. However, personnel
>       record information which, in the opinion of the judge in a judicial proceeding
>       or the hearing officer in a quasi-judicial proceeding, was not intentionally
>       excluded from the personnel record may be used by the employer in the
>       proceeding if the employee agrees or has been given a reasonable time to
>       review the information. Material which should have been included in the
>       personnel record shall be used at the request of the employee.

## V.      COUNT I, ALL DEFENDANTS: VIOLATIONS OF THE FAIR LABOR STANDARDS ACT, 29 USC SECTION 201 ET SEQ.

72-143.     Mr. Benjamin incorporates and re-alleges paragraphs 1-71 above as

        paragraphs 72-143 hereunder.

144.    At all times relevant, there existed and was in full effect a statute known as the

        Fair Labor Standards Act, 29 USC Section 201 et seq., which provides in relevant part(s),

[Section 207(A)](2) No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966— (a) for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966, (b) for a workweek longer than forty-two hours during the second year from such date, or (c) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

145.    Defendant(s) compensated Mr. Benjamin at a flat "per-job" rate for each of the foregoing weeks, despite the number of hours worked.

146.    By not increasing the rate of pay in weeks where Mr. Benjamin worked over forty hours, Defendant(s) violated the Fair Labor Standards Act, 29 USC Section 201 et seq., and its implementing regulations.

WHEREFORE, Mr. Benjamin prays for judgment against Defendant(s) as follows:

A.   In an amount of unpaid wages to be determined at trial; and

B.   Statutory damages in an amount equivalent to two times the unpaid wages as provided by 29 USC Section 216(b); and

C. Reasonable attorneys' fees and costs as provided in 29 USC Section 216(b); and

D. Such other and further relief as this Court deems appropriate and just.

## VI. COUNT II ALL DEFENDANTS: VIOLATIONS OF THE ILLINOIS MINIMUM WAGE ACT, 820 ILCS 105/ ET SEQ.

147-293. Mr. Benjamin incorporates and re-alleges paragraphs 1-146 above as paragraphs 147-293 hereunder.

294. At all times relevant, there existed and were in full effect implementing regulations of the Illinois Minimum Wage Act in the Illinois Administrative Code, Ill. Admin. Code tit. 56, Section 210.120, The Use of Federal Definitions of Various Terms, which provides in relevant part,

> For guidance in the interpretation of the Act and this Part, the Director may refer to the Regulations and Interpretations of the Administrator, Wage and Hour Division, U.S. Department of Labor, administering the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201 et seq.).

295. At all times relevant, there existed and was in full effect a statute known as the Illinois Minimum Wage Act, 820 ILCS 105/4a, which provides in relevant part,

> Except as otherwise provided in this Section, no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1 1/2 times the regular rate at which he is employed.

296.    At all times relevant, there existed and were in full effect implementing regulations of the Illinois Minimum Wage Act in the Illinois Administrative Code, Ill. Admin. Code tit. 56, Section 210.420, Regular Rate of Pay for Determination of Overtime, which provides in relevant part,

> b)    The regular rate is a rate per hour.  The Act does not require employers to pay employees on an hourly rate basis.  Their earnings may be determined on a piece-rate, salary, commission, or some other basis, but in such case the overtime pay due must be computed on a basis of the hourly rate derived from such earnings.

297.    At all times relevant, there existed and were in full effect implementing regulations of the Illinois Minimum Wage Act in the Illinois Administrative Code, Ill. Admin. Code tit. 56, Section 210.430, Methods of Computing Overtime, which provides in relevant part,

> c)    Day Rates and Job Rates:  An employee may be paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and receive no other form of compensation. In such a case, the employee's regular rate is found by totalling all sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked.  The employee is then entitled to extra half-time  pay at this rate for all hours worked over the maximum set by statute.

298.    Defendant(s) compensated Mr. Benjamin at a flat "per-job" rate for each of the foregoing weeks, despite the number of hours worked.

299. By not increasing the per-job rate in weeks where Mr. Benjamin worked over forty hours, Defendant(s) violated the Illinois Minimum Wage Act, 820 ILCS 105/ et seq., and its implementing regulations.

WHEREFORE, Mr. Benjamin prays for judgment against Defendant(s) as follows:

A. Statutory damages in an amount equivalent to two per cent of the unpaid wages assessed monthly as provided by 820 ILCS 105/12 et seq.; and

B. Reasonable attorneys' fees and costs as provided in 820 ILCS 105/ et seq.; and

C. Such other and further relief as this Court deems appropriate and just.

## VII. COUNT III ALL DEFENDANTS: VIOLATIONS OF 820 ILCS 115/ ET SEQ., THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT.

300-599. Plaintiff realleges Paragraphs 1 through 299 above, as Paragraphs 300-599 hereunder.

600. Defendant(s) deducted money from Mr. Benjamin's pay on numerous occasions, characterizing these deductions as "fines" for tardiness, departure from repair procedures, and other grounds, as provided for in the Handbook attached to this Complaint as EXHIBIT B;

601. On October 04, 2013, Defendant(s) made an unauthorized wage deduction of $127.00;

602. On October 25, 2013, Defendant(s) made an unauthorized wage deduction of $22.50;

603.    On December 13, 2013, Defendant(s) made an unauthorized wage deduction of $37.50;

604.    On January 03, 2014, Defendant(s) made an unauthorized wage deduction of $25.00;

605.    On January 24, 2014, Defendant(s) made an unauthorized wage deduction of $165.00;

606.    On February 28, 2014, Defendant(s) made a wage deduction of $475.00;

607.    On April 2, 2014, Defendant(s) made an unauthorized wage deduction of $150.00;

608.    On May 09, 2014, Defendant(s) made an unauthorized wage deduction of $30.00;

609.    On May 16, 2014, Defendant(s) made an unauthorized wage deduction of $260.00;

610.    On May 23, 2014, Defendant(s) made an unauthorized wage deduction of $60;

611.    On June 06, 2014 , Defendant(s) made an unauthorized wage deduction of $7.50;

612.    On June 13, 2014, Defendant(s) made an unauthorized wage deduction of $90.00;

613.    On June 20, 2014, Defendant(s) made an unauthorized wage deduction of $45.00;

614.    On July 18, 2014, Defendant(s) made an unauthorized wage deduction of $82.50;

615.    On August 15, 2014, Defendant(s) made an unauthorized wage deduction of $55.00;

616.    On August 22, 2014, Defendant(s) made an unauthorized wage deduction of $45.00;

617.    On August 29, 2014, Defendant(s) made an unauthorized wage deduction of $60.00;

618.    On September 26, 2014, Defendant(s) made an unauthorized wage deduction of $52.36;

619.    On October 24, 2014, Defendant(s) made an unauthorized wage deduction of $40.00;

620.    On November 14, 2014, Defendant(s) made an unauthorized wage deduction of $100.00;

621.    Defendant assessed additional unauthorized wage deductions totalling $550.00;

622.    Defendant(s) assessed a total of $2,479.36 in wage deductions, categorized as "fines," and did not seek or receive authorization for such deductions;

623.    At all times relevant, there existed and was in full effect a statute known as the Illinois Wage Payment and Collection Act, 820 ILCS 115/ et seq., which provides in relevant part,

> Sec. 2. For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties. Where an employer is legally committed through a collective bargaining agreement or otherwise to make contributions to an employee benefit, trust or fund on the basis of a certain amount per hour, day,

week or other period of time, the amount due from the employer to such employee benefit, trust, or fund shall be defined as "wage supplements", subject to the wage collection provisions of this Act.

As used in this Act, the term "employer" shall include any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed.

As used in this Act, the term "employee" shall include any individual permitted to work by an employer in an occupation…

624.    At all times relevant, there existed and was in full effect a statute known as the Illinois Wage Payment and Collection Act, 820 ILCS 115/9, which provides in relevant part,

Sec. 9. Except as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made...

625.    Defendant(s) deductions, totaling $2,479.36, were not made with Mr. Benjamin's

consent, were not pursuant to any statute or court order, and were to Mr. Benjamin's

detriment.

626.    At all times relevant, there existed and was in full effect a statute known as the

Illinois Wage Payment and Collection Act, 820 ILCS 115/14, which provides in

relevant part,

Sec. 14. (a) Any employee not timely paid wages, final compensation, or wage

supplements by his or her employer as required by this Act shall be entitled to

recover through a claim filed with the Department of Labor or in a civil action,

but not both, the amount of any such underpayments and damages of 2% of the

amount of any such underpayments for each month following the date of payment

during which such underpayments remain unpaid. In a civil action, such employee

shall also recover costs and all reasonable attorney's fees.


WHEREFORE, Mr. Benjamin prays for judgment against Defendant(s) as follows:

A.  In the amount of $2,479.36 of unlawful deductions; and

B.  In the amount of statutory damages appropriate pursuant to 820 ILCS 115/14; and

C.  Reasonable attorneys' fees and costs, pursuant to 820 ILCS 115/14; and

D.  Such other and further relief as this Court deems appropriate and just.


## VIII.  COUNT IV ALL DEFENDANTS: DECLARATORY JUDGMENT: INVALIDITY OF THE AUGUST 2014 CONTRACT.

626-1251.  Plaintiff realleges Paragraphs 1 through 625 above, as Paragraphs 626-

1251 hereunder.

1252. Defendant(s) have attempted to use the August 2014 Contract to define Mr. Benjamin as a non-covered employee.

1253. Defendant(s) have attempted to prevent Mr. Benjamin from pursuing his vocation by citing to the non-competition and non-solicitation elements of the August 2014 Contract via email and written communications.

1254. On October 15, 2015, Defendant(s) via email communication, stated that Mr. Benjamin could face legal action if he violated the putative August 2014 Contract, specifically saying, "If we find out down the road that something else needs to be dealt with regarding your client, such as concerns over what the property was used for in the interim (e.g. in conjunction with competition or a competitor) we will probably be quicker to take more significant action."

1255. In February of 2016, Defendant(s) sent a "Cease and Desist" letter to Mr. Benjamin. The letter read in relevant portion, "It has come to our attention that you have been soliciting current and former clients of HuffnPuff and wrongfully interfering with the business interests and relationships of the company with its clients. The conduct not only is in violation of your agreement with HuffnPuff, but also constitutes tortious interference with the company's business relationships. Accordingly, HuffnPuff demands that you CEASE AND DESIST from all actions which are in violation of your agreement…"

1256. The February 2016 "Cease and Desist" letter contained no specific instances of solicitation or interference.

1257.   Defendant(s) apparently relying on the language of the August 2014 Contract, via email on December 23rd, 2015, notified Mr. Benjamin that he was not an employee and thus not covered by the relevant Illinois employment statute.

1258.   Defendant(s) knew or should have known that the August 2014 Contract is a post-employment restrictive covenant, as it was presented to Mr. Benjamin at least two months after commencement of his employment.

1259.   Defendant(s) did not offer any inducement to enter into the August 2014 Contract, but rather presented it as a condition of continued employment.

1260.   No terms of Mr. Benjamin's employment by Defendant(s) changed as a result of execution of the August 2014 Contract.

1261.   The August 2014 Contract contains no severability clause.

1262.   The August 2014 Contract non-solicitation provision contains a time restriction of two years.

1263.   The August 2014 Contract non-solicitation provision was unreasonable as to time and scope.

1264.   A controversy exists as to whether the August 2014 Contract is a valid contract.

1265.   In Illinois, a valid contract requires at a minimum an offer, acceptance, and consideration.

1266.   In Illinois, a post-employment restrictive covenant must be supported by consideration other than continued employment.

1267.   In Illinois, a contract which purports to contract away statutory protections of employees, including all of the employment statutes cited in this complaint, are void *ab initio* and of no force or effect.

1268. This Court is empowered, pursuant to 28 USC Section 2201 to declare the rights

of Mr. Benjamin in regards to the August 2014 Contract.

WHEREFORE, Mr. Benjamin prays that this Court offers relief as follows:

A.     A declaration that the August 2014 Contract was invalid and of no force or

effect; and

B.     Such other and further relief as this Court deems appropriate and just; or

C.     In the alternative, should the Court find that the August 2014 Contract is

valid in part, Mr. Benjamin prays for a declaration that the non-

competition/non-solicitation restrictive covenant is unenforceable as

unreasonable in temporal and geographical scope and unreasonably vague;

and

D.     Such other and further relief as this Court deems appropriate and just.

## IX.  COUNT VI ALL DEFENDANTS: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

1269-2537.        Plaintiff realleges Paragraphs 1 through 1268 above, as Paragraphs

1269-2537 hereunder.

2538. Defendant(s) have used the language of the August 2014 Contract to issue legal

threats to Mr Benjamin.

2539. On October 15, 2015, Defendant(s) via email communication, stated that Mr.

Benjamin could face legal action if he violated the putative August 2014 Contract,

specifically saying, "If we find out down the road that something else needs to be

dealt with regarding your client, such as concerns over what the property was used for

in the interim (e.g. in conjunction with competition or a competitor) we will probably be quicker to take more significant action."

2540.   On February 12, 2016, Defendant(s) sent a cease-and-desist letter ("Cease and Desist Letter") which read in relevant part:

> It has come to our attention that you have been soliciting current and former clients of HuffnPuff and wrongfully interfering with the business interests and relationships of the company with its clients. This conduct is not only in violation of your agreement with HuffnPuff, but also constitutes tortious interference with the company's business relationships. Accordingly, HuffnPuff demands that you CEASE AND DESIST from all actions which are inviolation of your agreement; as well as all actions which are intended, or reasonably anticipated, to interfere with HuffnPuff's business relationships or damage its standing and reputation in the business and client-base communities. This demand specifically includes, but is not limited to unlawfully: soliciting HuffnPuff's clients and customers, engaging in services for HuffnPuff's clients and customers, diverting business from HuffnPuff, disparaging or defaming HuffnPuff or its owners and employees, or otherwise breaching your agreement with HuffnPuff. The seriousness of this demand cannot be understated. A failure to immediately comply with this demand will result in HuffnPuff taking any and all legal action available to stop your misconduct and compensate it for damages incurred. This includes but is not limited to civil suit against you seeking monetary and injunctive relief. Note that by making this demand HuffnPuff is not waiving any of its rights to pursue you or seek remedy for damage already incurred. To help ensure that you understand and intend to comply with this demand, within 7 days of your receipt of this correspondence, contact our office (yourself or through your attorney) and confirm that you understand and intend to comply. Failure to do so will be interpreted as an admission that you do not intend to comply and will persist in your unlawful and improper conduct.

2541.   The February 2016 "Cease and Desist" letter contained no specific instances of solicitation or interference.

2542.   In response to a request for his personnel records pursuant to the Illinois Personnel Records Review Act, Defendant(s), apparently relying on the language of the August 2014 Contract, via email on December 23rd, 2015, notified Mr. Benjamin

that he was not an employee and thus not covered by the relevant Illinois employment statute.

2543.   The August 2014 Contract is a post-employment restrictive covenant, as it was presented to Mr. Benjamin at least two months after commencement of his employment.

2544.   Defendant(s) did not offer any inducement to enter into the August 2014 Contract, but rather presented it as a condition of continued employment.

2545.   No terms of Mr. Benjamin's employment by Defendant(s) changed as a result of execution of the August 2014 Contract.

2546.   The August 2014 Contract contains no severability clause.

2547.   The August 2014 Contract non-solicitation provision contains a time restriction of two years.

2548.   Upon information and belief, Defendant(s) knew or should have known that the August 2014 Contract was unsupported by consideration and of no effect.

2549.   Upon information and belief, Defendant(s) communicated with its clients in the relevant consumer community and warned them off of hiring Mr. Benjamin as a technician.

2550.   Upon information and belief, Defendant(s) communicated that Mr. Benjamin was precluded from working for them as a result of the existence of the August 2014 Contract.

2551.   Mr. Benjamin declined to pursue client relationships with several potential clients as a result of Defendant(s) Cease and Desist letter and other communications intimating legal action would result.

2552. Deterred from pursuing opportunities to compete in the marketplace and among the class of Defendant(s) clients, otherwise readily available to him, Mr. Benjamin suffered a loss of income and economic opportunity.

2553. Mr. Benjamin was deterred from pursuing his livelihood and was wrongfully prevented from entering a market to which he was otherwise legally permitted to enter, suffering loss of income and opportunity to develop his own business and ply his trade.

2554. Defendant(s) acted with actual malice towards Mr. Benjamin, to intimidate him and prevent him from entering into competition with them.

2555. By relying on an illusory contract, Defendant(s) acted without justification.

WHEREFORE, Mr. Benjamin prays that this Court offers relief as follows:

    A.     Compensatory damages in an amount to be determined at trial; and

    B.     Punitive damages; and

    B.     Such other and further relief as this Court deems appropriate and just.

**JURY DEMAND**
PLAINTIFF hereby demands a trial by jury for all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully Submitted,
Morgan Benjamin

By and Through Counsel:

Ramsin Gewargis Canon, Esq.
Illinois State Atty # 6319074
ramsin@canonlawgroup.com

Bradley J. Loberg, Esq.
Illinois State Atty # 6292135
brad@canonlawgroup.com

Canon Law Group, P.C.
405 W Superior Street
Suite 511
Chicago, IL 60654
Phone: (925) 698-9216

# "EXHIBIT A"

## Service Contractor Agreement

This agreement is made this 15th day of August, 2014 by and between the following parties:

### Contractor:

Name: Morgan Benjamin
Title: Field Technician
Address: 565 Acadia Trail
City, State, Zip: Roselle, IL 60172
Telephone: 847-845-2045
Email: morganforreal@gmail.com

### Client:

Huff-n-Puff Fitness Repair, LLC
PO Box 1184
Warrenville, Il 60555
Tel. 630-272-0494
Email: Dan Thompson dan@hnpfit.com

**Client** agrees to:

(i)     Refer such service/repair orders to Contractor as Client may from time to time choose to refer, or to review, and in Client's sole discretion accept or reject, any additional service/Repair orders which Contractor generates from previously referred service/repair customers of Client or from other new service/repair customers.

(ii)    Pay Contractor as follows:

**50% of all trip, PM and labor charges** from Client to Client's customer, minus any customer discounts to include travel to and from the customer site.

Client will also provide any manufacturer's instructions, training, or other support needed to assist Contractor to be able to perform the work orders so referred, and may, at Client's sole discretion, provide marketing materials, contracts, or other support documents and publications needed for Contractor to generate additional service/repair orders.

(iii)  Maintain liability insurance as Client deems necessary to cover Client and Contractor.

**Contractor** agrees to:

(i) Do the work specified in the Client service/repair customer orders referred at such times as Contractor shall make a service appointment with the service customer named in the repair order or at such other times as Client and Customer shall otherwise agree,

(ii) Do the work with tools supplied by Contractor or, at Client's discretion, supplied by Client from specialized tools specified by equipment manufacturers, which tools shall be returned to Client or otherwise stored and used as Client shall from time to time specify,

(iii) Do the work at service customer locations or at such other premises as Contractor may from time to time choose to use for repair operations;

(iv) Do the work promptly and in a good and workmanlike fashion and in accordance with Client's policies and procedures,

(v) Account to Client promptly for work done and any expenses incurred in doing the work,

(vi) Maintain, at Contractor's expense, a mutually agreeable policy of workers compensation insurance naming Client as a named insured and also to hold Client harmless for any claims or liabilities which may result to Client as a result of Contractor's having traveled to or from or performed services at any such service/repair locations.  Pay will be reduced by 5% when said workers compensation insurance is not in effect (e.g. 50% down to 45%), and

(vii) Not solicit any of Client's customers with any products or services not approved by the Client.

**Client and Contractor** agree that:

(i) **Contractor** is not an employee of Client, and is free to do similar work for any persons or organizations not referred to Contractor by client as service/repair order customers at any time. Contractor agrees not to work for such service/repair order customers as Client shall from time to time refer except as Client shall from time to time give permission to serve. This restriction shall not apply to any service/repair customers who request services from Contractor more than two years from the last date on which Client shall have referred a service/repair order naming them as customers of Client to Contractor.

(ii) **Client** and **Contractor**

a. Agree they each are responsible for their own tax reporting duties, accounting, legal fees, and other costs of performance and administration of this contract. They also agree that each is duly authorized to make this contract.

b. Agree that this contract was made at Client's above named address, shall be interpreted according to the laws of the state of Illinois, and shall, if the parties disagree on terms or performance of same, be subject to resolution of disputes by the circuit and state courts having jurisdiction in Kane County, Illinois, and both parties agree to the jurisdiction and venue of same.

c. Agree that all notices to each other shall be provided by email with copy by U.S. Mail, certified mail, to the addresses above named.

AGREED AS OF THE DATE ABOVE NAMED:

_____(X)
Contractor, by Morgan Benjamin, Field Technician

_____(X)
Client, by Dan Thompson, President

# "EXHIBIT B"



Repairs · Assembly/Disassembly · Preventive Maintenance

# Field Technician Handbook

Version 1.0 05MAY2014

Table of Contents

1. Technician Expectations
    A. Vehicle
    B. Attire

C. Footwear
D. Scheduling/Time Off
E. ID Badge
F. Tool bag
G. Parts Kit

2. Before the Service Call

3. During the Service Call
A. The Machine
B. The Customer
C. Special Situations
    I. Incorrect Diagnosis
    II. Warranty/Bill To Jobs
    III. Walking Belts
    IV. Machines Not Worth Repairing
    V. Custom Cables
    VI. Commercial Stickers

4. After the Service Call (Wrap Up Procedure)

5. Storage Unit Procedures

6. Office Contact

7. Penalties


1. Technician Expectations

As the premier fitness equipment service provider in Chicago we demonstrate a much higher level of service quality and value for our customers. As the face of the company, this starts with our field service techs. Professionalism and courtesy are paramount in each and every situation.

A. Technicians are required to arrive in a clean, well kept vehicle. Nothing fancy, just nothing that looks like it's falling apart either.

B. Company shirts, sweatshirts and jacket will be provided.  Pants are your responsibility, we recommend Dickies Double Knee Work Pants that are readily available online and in store for $25 or less.  Clothing should be clean with no holes, tears or stains.

C. Boots are the recommended footwear but that is your choice.  Once again, footwear should be clean and presentable looking.  Polished black work boots are a very good option as we have found customers rarely request those be removed when entering their home.

D. Any day with less than four jobs scheduled is subject to additional jobs being scheduled last minute with no notice.  If you made plans (or need any time off) that request must be emailed in with as much notice as possible.

E. You will be given a company ID badge.  Use it!  You do not need to wear it at all times but at least keep it handy in your bag.  This is especially useful in schools.

F. Each tech is required to keep a fully stocked tool bag with all the tools necessary to complete each job.  A recommended tool list will be provided, let the office know if anything should be added to it.

G. All technicians are required to keep their Parts Kit full at all times.  If you use anything out of it, email/text immediately letting the office know what it is you need replaced.  Keep the following in your kit at all times:
 -1 Power Extender
 -4 Internal brake cables
 -2 PaceMaster speed sensors
 -A supply of sales brochures
 -A supply of PM stickers
 -Reserve stash of HnP and FFO business cards
 -2 3-packs of TD syringe lube.  If they don't want to buy them direct from you, customers can always purchase them from our website.

2. Before the Service Call

A. Make sure you have the parts you need.  There's nothing much worse than showing up empty handed.  Make sure the parts are not damaged.  That's not any better than showing up empty handed.  Techs will not be paid for incorrect/damaged parts brought to the customer's location.

B. Call the customer 20-30 minutes before your arrival AT A MINIMUM.  More warning is always better, especially if you will be early.  The more they like you, the higher they will tip!  If they do not answer twice, call the office, we will try them again.  Unfortunately, techs will not be paid for no-shows.

C. It's always a good idea to double check the address with the customer.  It is extremely rare but mistakes do happen.

D.  If a customer does not answer the phone, it is the tech's decision if they would still like to go to the customer's home in the hopes they will

be there.  If they are not there upon your arrival, leave a card in the front door with the date and time on it.  Once again, techs will not be paid for no-shows.

E. If the customer will not be available to receive you at a time within their designated window, use your judgement.  You may move to the next job and come back later, or tell them we will call them to reschedule for another day if that does not work with your schedule for that day.

F. Don't be late.  If you are going to be late, call into the office immediately after making that determination so we can adjust things as necessary.  It is each technician's individual responsibility to ensure they begin their day early enough to make all their appointments on time.  If your day looks especially heavy and you are concerned about being on time, arrive at your first job at 7:30.  I've done this many times and everyone has been thrilled to be the first of the day.  Call them the night prior to let them know you will be early, they will appreciate it.

G. Review the invoice and calendar to ensure they match and are correct.  If not, let the office know so it can be corrected and resent.

H. Someone over the age of 18 needs to be at the home at all times. This is especially important in the case of underage females.  You are NOT allowed under ANY circumstances to be alone in a home with an underage female, period.

3. During the Service Call

  A. The Machine

    1. Diagnose a machine in its entirety, not just the issue the customer called about or that is listed on the invoice.

    2. If you are unsure about a diagnosis, call the manufacturer, that's why I pay for your company phones every month, it's not cheap.

    3. Diagnose a machine before PMing it.  Every customer is told, "if we are unable to repair your machine, we will forgo the PM and will only diagnose it.  Then, your cost will drop to $90."  Use your discretion here. If you know a machine is not worth repairing but could benefit from the PM, explain it to the customer and proceed as they direct. There are many cases where it is worth it to PM it and bring it to the best possible condition for an extra $30, but not worth throwing parts at it.  Once again, CHECK WITH THE CUSTOMER FIRST and obtain their approval before moving forward.

    4. If a machine has frame issues, we need a bunch of pictures, video is beneficial as well.  When an entire machine needs to be replaced under warranty, the manufacturer will not take our word for it, we need to have proof.  I don't want to send you back for free nor do you want to go back unpaid.

    5. Higher end treadmills can have their decks flipped.  If this is possible, it is the tech's responsibility to determine if this is the case. You should be able to feel a coat of wax on the underside if it is able to

be flipped.  This information is part of your wrap up, be sure to include it.

6. If the parts ordered do not fix the problem the office needs to be called from the customer's location.  Period.  More on that later.

7. If we receive parts that do not fit the machine, a picture of both, in a way that clearly shows the difference between the two needs to be sent to the office immediately.

8. If a machine shows evidence of flood damage we cannot work on it.  Explain this to the customer: "The interior of these machines are powder coated to protect against sweat and other moisture, the interiors are not.  Once water enters the interior of the frame it will start to rust the machine from the inside out.  Once the machine starts to rust it is only a matter of time before you experience catastrophic frame failure.  Everything will look fine but as you are running the frame will fall apart underneath you and your face will slam into the console.  We will be happy to provide you with an insurance write up that we will submit to your insurance company on company letterhead explaining all this for $120."  Don't use a flooded machine.  Do it for your face.

9. Check the shipping paperwork to see if parts need to be sent back to the manufacturer.  If it is unclear, call them and ask.  **Any invoices for parts not returned will be the responsibility of the technician.**

10. Be sure to leave 2 of our business cards and 1 of FFO's with each customer, either hand it to them or leave them in the cup holder of the machine.  That is the only physical marketing material we leave in a customer's home and is extremely important, especially with warranty labor jobs.  No one makes money on warranty jobs, we need them to call us back when it's out of warranty for that to be worth it.  If you need more cards let me know, I have plenty of them.


B. The Customer

1. Explain to the customer what is wrong with the machine or what you did.  Explain it in a way they can understand.

2. Our warranty is 30 days on the labor and to the extent of the manufacturer's warranty on the parts (usually 90 days).

3. If a customer orders parts from us without us diagnosing it they have to pay for the parts and shipping or restock fees.  This is explained to them over the phone.

4.  If a customer is being charged for a restock fee, call us to have the invoice reworked and sent to you.  Do not use the original invoice.

5. If the customer purchased or received parts at their location the tech is **not** to remove the parts from their location under any circumstances.  If the parts were brought to the location by the tech, give them the option of keeping the old parts if they prefer.  If they do not, be sure to remove all parts, boxes and packaging materials from their location.  Leave their location cleaner than you found it.

6. If it is not on the invoice, you do not have authorization to work on it.  We will be happy to diagnose/PM/fix any additional machines when we are already there but the office will have to be called for approval and the charges added to the invoice before beginning any work not listed.  This also applies to situations where we are told the belt needs to be aligned but then the customer expects us to install a belt, deck, motor and MCB they purchased themselves.  Happy to do it, but these two jobs cost vastly different amounts.

7. Have the customer sign the correct invoice.  Email the correct invoice to the correct email address.  If your email gets kicked back, resend it to the correct address.  If the customer refuse to sign or is not available to sign, submit the following to the office immediately:
-Name and title of person refusing to sign

-Reason for their refusal
-Picture of the machine or machines you worked on

8. Do not give the customer any pricing!  This never fails to bite us in the rear.  It's fair to say you are the tech, you turn the wrenches, you have nothing to do with it.  Let them know, "The office will call you [the customer] the next day or sooner with an exact quote."

9. Tell the customer about the Angie's List Review link in the invoice email.  Each positive review will be a $10 addition to your next check!

10. Regardless of the outcome of any job, explain our reciprocal agreement with FFO.  The more referrals they get from us the more work they will send us, it works out for everyone.  This can be used by anyone at any time at any store.

11. Payment needs to be collected at each residential job at the time of service.  Warranty/Bill To jobs will obviously be billed.  Attempt to collect at commercial jobs.  If payment is not available, remind them late fees will be charged after 30 days (10% per month, it's on the invoice).  Keep an adequate supply of envelopes in your car/on your person, turn in all payments each time you are at the storage unit.

12. If the customer is paying by check make sure everything is filled out correctly.  Company name, date, amount (x2), and signature.

13. If the customer is paying by card, you must include the invoice number in the description field.
C. Special Situations

I. Incorrect Diagnosis
   a. Call the office immediately to inform us what additional parts are needed.
   b. Sit and wait.
   c. As soon as possible (this will vary), the office will call you back with a parts and shipping total.

d. Inform the customer of the additional charges.  Explain they are being charged for additional parts ONLY, no additional trip or labor charges are being added.

e. Explain to the customer they can:

    i. Only have original parts installed if they are not worried about the additional issues.  In this case, proceed as normal.

    ii. Agree to the added parts charges.  In this case, you may leave the parts installed if you would like to save time.  Do not collect payment, the full total will be due upon completion of the repair.  In the event the customer changes their mind later, you will be responsible for recovering those parts, that will not be paid.

    iii. Decline the entire repair.  In this case, remove all parts and return to the storage unit.  Do not collect any payment from the customer.

II. Warranty/Bill To Jobs

If the customer being serviced is not the one paying for the work, do NOT discuss any money related matters to them, period.

III. Walking Belts

If a walking belt needs to be replaced, measure both the width and length.  Measure halfway down the front and rear rollers and multiply by 2 to calculate the total belt length.  If a belt looks stretched, subtract the needed amount from the total so the new belt fits properly.  Remember, 2 inches from the total length will only result in 1 inch of roller movement.  Techs will be held responsible for their belt measurements.

IV. Machines Not Worth Repairing

If a machine is too far gone and not worth quoting, let the customer know.  Ask the customer if they would like a quote, we would be happy to do it, but if you can tell it is not worth putting the money into, let them know.  Every machine we do not need to quote saves the office about half an hour of time that could be spent generating more work.

V. Custom Cables

If you diagnose a machine as needing cables, indicate if they are cables we are able to custom make in your wrap up.  We can make most of them but not some cables with specialized ends.  It is the technician's responsibility to let the office know.

VI. Commercial Stickers

All commercial accounts we PM are required to be stickered if they have more than two units.  Call the office immediately after your arrival to record all this information.  Use your supply of serialized stickers, the old style stickers will no longer be used.  In the event a machine has been stickered with the old system, it will need to be re-stickered with the new serialized stickers.  Remove the old sticker and replace it with a new one.  Do NOT place the new sticker over the old, it will wear off extremely quickly.  When calling the office to update the old system feel free to use the old sticker number as a reference, it will make all this go much more quickly.  If this is not done you will be going back unpaid to complete the job. It is the tech's responsibility to call the office with all this info when needed, as well as have an adequate supply of stickers at all times.

4. After the Service Call (Wrap Up Procedure)

A. Wrap ups need to be completed at the customer's location and submitted immediately.  A wrap up needs to be completed for each job on your calendar, no exceptions.  If it's not in the wrap up, it didn't happen.  Better safe than sorry, cover your rear with as much info as you need to.  If a customer has more than one location, a wrap up needs to be completed before leaving each location.

B. Invoice number/customer name.  Easy and self-explanatory.

C. M/M/S on every machine we touch.  If it isn't on the invoice, we don't have it and you need to submit it.  This includes console serial numbers! Some machines have them, some don't, you will just need to learn what machines do and don't.  If you are unsure, call the manufacturer and ask. Double check it against the invoice to ensure the invoice is correct.  If any one of those is not available, send pictures to the office immediately. At the very least we need the following five pictures:
-Console close up
-Side view of machine

-View from user rear of machine
-Close up of interior (motor compartment, pulley assemblies)
-Area where this information *should* be but isn't
Additionally, we will need all the info off the needed part possible. Pictures, measurements, size, etc.

D. Full diagnosis of entire machine.  I don't care what the customer says, I don't care what's on the invoice, your job is to diagnose the machine completely.  If you think there is a chance the problem could come back, inform the customer and put it in the wrap up.  The more info we have and the more the customer knows (and knows to expect) the less likely the chance for a free callback.

E. List ALL parts needed for the repair.  It needs to be black and white, there is no gray area.  Wrap ups need to contain ALL the information we need to place parts orders including why a part needs to be replaced.  This is especially important with warranty parts.  It is each tech's responsibility to ensure the office is able to understand exactly what parts they are referring to.

F. Time required MUST be listed for all jobs as well.

G. The word 'maybe' (as well as all its synonyms) is not allowed in a wrap up.  If you are unable to test something due to another issue, let us know.

H. If an order is placed in the field make note of the order number as well as the name of who you placed it with and send it in with your wrap up.  This is extremely helpful to the office staff.  If you already have them on the phone, please place the order.  Help us help you!

I. Ensure the order is going to be shipped directly to us (1650 N Randall Rd #1177, North Aurora, IL 60506).  Life Fitness, Smooth and Icon are the only companies that are militant about sending parts directly to the customer.  Try to have them send it to us, if they refuse, it's ok if they ship to the customer.  All other manufacturers MUST ship directly to us,

no exceptions.  If anyone not from the three companies mentioned above will not ship us parts, do NOT place the order.  Note the service rep's name, the case/order number and put it all in the wrap up.

J. If you need an exploded, put it in the parts needed section, we'll be happy to send it to you.  Leaving the parts needed section blank and only asking for an exploded is a perfectly acceptable way to fill out a wrap up, just make sure you respond to the exploded within an hour.  If it takes more than four words to describe a single component, ask for an exploded.
K. Complete means complete, Incomplete means incomplete.  Please don't screw that up, its about as basic as it gets.


L. If you realize something was left out of a wrap up, call/text/email us with the info immediately, do not make us chase you for it.  If you did not obtain any part of the info required and have already left the customer's location (left the driveway) do NOT call the customer, call Dan immediately and wait for further instructions.

5. Storage Unit Procedures

   A. When enroute, text the office to let us know you are on your way.

   B. Call the office as soon as you get there.  We will then be able to tell you what you need.  Obviously, grab everything on your designated shelf.  We may have you check in newly arrived parts as well.  If the office is unable to answer, please leave the office a message letting us know what parts you did take.

   C. Parts that need to be returned must be placed on the workbench, in a ready to ship condition, with the return labels and paperwork at the top of the box.  Don't leave your garbage there, or parts that don't need to be returned, those will end up back on your shelf.

   D. Place money in the money box.  Please don't forget.  Make sure all cash payments are itemized on the front of the envelopes provided.

   E. Restock on cards, money envelopes and lube, if needed.

6. Office Contact

   A. Calling the Office

The office spends their days on the phone working hard to generate more work for all of you.  We will not always be available to answer.  If we don't, text immediately.  Often, if we can't take a call, we can still text back and forth to answer your question and get you moving ASAP.  If you would rather text than call to begin with, that works just as well if not better.  Call if necessary, but please try to keep all calls short and to a minimum.

B. Emailing the Office
When emailing anything to the office (pictures, invoices, work orders, wrap ups, literally anything), we need both the invoice number and customer name in either the subject line or the body of the email.

7. Penalties

Penalties for substandard performance will be assessed, per occurrence, as follows:

   A. No show: -$100, job free of charge at the customer's time of choice

   B. Callback or incorrect diagnosis: -$30.  One forgiven every week.

   C. W/U info submitted with errors (i.e. wrong s/n): -$15

D. W/U info not submitted in accordance with above guidelines: -$30

E. Incorrect parts ordered due to unclear communication to the office: cost of parts plus an unpaid callback.

F. Performing work not on the invoice: -$30

G. W/U not submitted immediately: -$10/hour

H. Late to a job with less than 1 hour notice to the customer: -$25

I. Not responding to an office request within 1 hour: -$15/hour

J. Not turning in a payment that was collected: -$(amount of payment)

Your pay structure is built on the assumption you will perform your job perfectly.  There is no margin for error.  You will be paid according to your performance.  We have built a reputation as the best fitness equipment service provider, that reputation needs to be maintained.  Our customers expect perfection for the price they are paying, that perfection needs to be demonstrated in each and every job we do.  This is not being done to lower your pay, this is being done to ensure the continued success of us all.